# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

No. 03-1414

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Stephen Erhart, also known as | * | CR01-300 DWF/AJB |
| Stephen Anthony Erhart, | * | |
| | * | |
| Appellant. | * | |

Submitted: February 11, 2004
Filed: July 29, 2005

Before MELLOY, SMITH, and COLLOTON, Circuit Judges.

SMITH, Circuit Judge.

Stephen Erhart pleaded guilty to twenty-nine counts, including conspiracy, false statements, health-care fraud, and money laundering charges. The district court[1] also found Erhart guilty of two separate drug and gun charges, and sentenced him to a term of 108 months' imprisonment and three years' supervised release. He was also required to pay a $3,100 special assessment to the crime-victims fund, and required to pay restitution in the amount of $1,234,270. On appeal, Erhart argues that the

[1]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

district court erred (1) in its conclusion that he was guilty of the firearm offense, (2) erred in setting the fraud rate at seventy-five percent, (3) erred in not granting an acceptance of responsibility adjustment, (4) erred in granting an abuse of a public trust and a role enhancement, and (5) erred in its restitution calculation. Finding no error, we affirm Erhart's conviction and sentence.

## I. *Background*

The substantive facts of the case are not in dispute. Advantage Plus Chiropractic Clinic (APCC) was formed in 1996 by Stephen Erhart and Coral Peterson. Erhart, a licensed Doctor of Chiropractic, treated individual patients and drafted treatment notes for the care provided.

Sometime in 2000, the Federal Bureau of Investigation ("FBI") commenced a health-care fraud investigation of APCC. The FBI used two cooperating witnesses, Tyrone Robinson and Mollie Robinson. Audio and video devices were used to conduct an undercover surveillance of APCC for several months. Based upon its investigation, the FBI concluded that Erhart had engaged in extensive health-care fraud schemes through APCC. The fraud schemes included paying "runners" to refer patients, falsifying documents, and submitting fraudulent bills to insurance companies for services not rendered.

In October 2001, a grand jury indicted Erhart on thirty-one counts of illegal conduct involving his chiropractic billing, cocaine possession, and unlawful possession of a firearm[2]. In March 2002, Erhart entered guilty pleas to most of the charges. Specifically, he confessed to his involvement in a fraudulent billing scheme, acknowledged Peterson's involvement, provided the names of the runners involved

---

[2]During Tyrone Robinson's second visit, Erhart sold Robinson a sawed-off shotgun. The gun was operable, and the barrel measured less than eighteen inches in length.

in the fraud, admitted that ninety-five percent of his business was fraudulent, and provided the names of individual patients who participated in the scheme. Erhart also pleaded guilty to one count of conspiracy to defraud health-care benefit programs, four counts of false statements related to health-care matters, ten counts of health-care fraud, and fourteen counts of money laundering.

Peterson signed a plea agreement acknowledging that seventy-five percent of APCC's business was fraudulent, which amounted to $1.2 million. Erhart was offered a similar agreement, but declined. He also elected to contest the drug and firearm possession charges. After a bench trial, Erhart was convicted on all offenses. In addition to the counts to which Erhart pleaded guilty, the district court also found him guilty of one count of possession with intent to distribute cocaine, and one count of unlawful possession of a firearm.

At sentencing, Erhart disputed the seventy-five percent fraud figure, arguing that it should have been lower. Erhart stated that he did not recall admitting to a ninety-five percent fraud rate and contended that any estimate that he may have given resulted from FBI pressure. The government presented evidence that Erhart was responsible for $3.7 million in reasonably foreseeable losses sustained by insurance companies. In rebuttal, Erhart introduced evidence that the amount of fraudulent business that he conducted was actually around forty percent or about $400,000. The district court sentenced Erhart to 108 months' incarceration, three years' supervised release, a special assessment to the crime-victims fund, and ordered him to pay restitution of $1.2 million. Erhart timely appealed the issues set out above.

## II. *Discussion*

### A. *Firearm Conviction*

Erhart first argues that the district court erred in convicting him of possession of a firearm with a barrel less than eighteen inches. Specifically, he argues that there was insufficient evidence to show that he knew the characteristics of the prohibited

weapon. "In passing upon the sufficiency of the evidence to sustain an ultimate finding of guilt following a bench trial, we apply the same standard of review that is applied where a defendant has been found guilty by a jury; that is to say, the finding must be sustained if it is supported by substantial evidence." *United States v. Barletta*, 565 F.2d 985, 991 (8th Cir. 1977). On review, we will consider the evidence in the light most favorable to the guilty verdict. *United States v. Carter*, 270 F.3d 731, 734 (8th Cir. 2001).

We begin our analysis by noting that it is unlawful for any person to receive or possess certain firearms that are not registered to him in the National Firearms Registration and Transfer Record or that are not identified by serial number. 26 U.S.C. § 5861(d). One weapon prohibited by this statute is "a shotgun having a barrel or barrels of less than 18 inches in length." 26 U.S.C. § 5845(a)(1). Although the statute is silent as to the requisite mens rea for illegal possession, we have concluded that the "only knowledge required to support a conviction under the [National Firearms] Act is knowledge that the weapon is a 'firearm' as that term is *generally* defined." *United States v. Barr*, 32 F.3d 1320, 1323 (8th Cir. 1994) (emphasis in original). The Supreme Court has held that to violate the National Firearms Act, the owner of the weapon must have known that the weapon he possessed had the characteristics that brought it within the statutory definition of a firearm. *Staples v. United States*, 511 U.S. 600, 602 (1994). Following the logic of *Staples*, we have further concluded that if the characteristics of the weapon render it "quasi-suspect,"[3] then the owner of the weapon does not have to know the specific characteristics to violate the Act. *Barr*, 32 F.3d at 1324.

---

[3]Our "quasi-suspect" classification requires only a common-sense evaluation. A finding of knowledge of the weapon's incriminating characteristics is unnecessary because, unlike the firearm described in *Staples*, a sawed-off shotgun is not a traditionally-lawful weapon and Erhart "had no legitimate expectation that the weapon was not subject to regulation." *Barr*, 32 F.3d at 1324.

The government argues that Erhart's weapon was "quasi-suspect," and he had knowledge that it was a sawed-off shotgun. Erhart responds that he did not know that the shotgun barrel was less than eighteen inches.[4] Erhart claims that "there is no principled reason to suggest that Congress intended the eight categories of firearms listed in the definition section of the [National Firearms] statute to have different mens rea elements." *United States v. Reyna,* 130 F.3d 104, 109 n.5 (5th Cir. 1997). We disagree.

The *Staples* decision involved a fully-automatic machine gun. *Staples*, 511 U.S. at 602 (1994). However, to discover its automatic firing capacity, one had to fire it. *Id.* Staples testified that he had never fired the gun, and the Court found that, essentially, Staples innocently owned a machine gun. *Id.* The Court decided that it would be unfair to convict Staples of possessing the firearm because he had no way of knowing that it was illegal. *Id.*

In contrast, Erhart possessed a sawed-off shotgun that was visibly altered to such a degree that the weapon was "quasi-suspect." Further, Erhart made several admissions demonstrating that he knew the weapon unlawfully shortened. He acknowledged his nervousness about owning the gun, and he repeatedly referred to it as a "sawed-off." Erhart described the gun's usefulness by stating, "Well, I'll tell you what. This is some definite protection." He also told Tyrone Robinson that a prior owner has "shot it a couple [of] times . . . [and] said he blew a hole right through the damn door." When Robinson inquired if the gun would be useful for hunting, Erhart responded "I don't know [], I don't think it works for ducks though. I think you need a longer barrel though."

---

[4]Erhart's argument is premised on his assertion that our court's *Barr* precedent should be overturned because it interpreted *Staples* incorrectly. Passing judgment on the controlling law of this circuit, however, is beyond our panel's reach. Therefore, we do not address the merits of this argument.

Sufficient evidence supported the finding that Erhart knew that the gun he possessed was an illegal sawed-off shotgun. We affirm Erhart's conviction under § 5861(d).

B. *Booker Error*

After his case was submitted for oral argument, but before we issued an opinion, the United States Supreme Court issued its ground shifting decision in *Blakely v. Washington*, 542 U.S. 296 (2004). The *Blakely* decision was extended to the United States Sentencing Guidelines in *United States v. Booker*, 125 S. Ct. 738 (2005), which rendered the Guidelines advisory. Nonetheless, the Court explained that a *Booker* claim not argued at the district court would be subject to application of the plain error test. *Booker*, 125 S. Ct. at 769. In *United States v. Pirani*, 406 F.3d 543, 550 (2005) (en banc), we held that there must be "a specific reference to *Apprendi* or *Blakely* or the Sixth Amendment" to preserve a *Booker* claim. Under our plain error analysis, Erhart is required to show "a 'reasonable probability,' based on the appellate record as a whole, that but for the error he would have received a more favorable sentence" to show that his substantial rights were affected. *Id.* at 552 (applying the third prong of the plain error test found in *United States v. Olano*, 507 U.S. 725 (1993)).

In this case, Erhart did not argue *Apprendi*, *Blakely*, or the Sixth Amendment to the district court, and, thus, we review his *Booker* argument for plain error. Nothing in the record indicates that the district court would have given Erhart a lesser sentence had it viewed the Guidelines in an advisory capacity. *See Pirani*, 406 F.3d at 553. As such, Erhart's *Booker* claim fails.

C. *Loss Determination*

Erhart argues next that the district court erred in setting the fraud rate at seventy-five percent. Specifically he argues that the court discounted all evidence regarding the fraud rate and decided to adopt the rate from the pre-sentence report ("PSR"). We review Erhart's claim that the district court erred in its calculation of the loss determination for clear error. *United States v. Dolan*, 120 F.3d 856, 870 (8th Cir. 1997); *see also United States v. Mashek*, 406 F.3d 1012, 1017 (8th Cir. 2005) (explaining that, post *Booker*, we still review factual findings made by the district court for clear error).

We note that, although the sentencing court is not expected to determine the fraud rate and attributable loss with precision, it should make a reasonable estimate of the loss, given available information. *United States v. Wells*, 127 F.3d 739, 748 (8th Cir. 1997). It is the government's burden to prove the amount of fraud loss by a preponderance of the evidence. *United States v. Coon*, 187 F.3d 888, 899 (8th Cir. 1999). However, the district judge "is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1, app. n.2(c).

The crux of Erhart's argument is that the district court cannot discount the evidence Erhart introduced and rely solely on the PSR. Erhart correctly notes that the PSR is not evidence and is not legally sufficient for making findings of fact on contested issues. While Erhart is accurate in his statement of the law, he is inaccurate in his characterization of the district court's finding. The district court did not rely solely on the PSR to reach a reasonable fraud rate.

Due to the nature of the business, it was virtually impossible for the court to determine the precise fraud rate. The court, therefore, was required to make a

reasonable estimate of the loss based on the evidence submitted. Erhart himself originally admitted that ninety-five percent of his business was fraudulent. Peterson, Erhart's co-conspirator, acknowledged that over seventy-five percent of the business was fraudulent. Erhart later provided evidence that the fraud rate was actually only about forty percent.

Erhart argues that the district court improperly discounted the evidence establishing the rate at forty percent in its entirety. However, had the court completely discarded Erhart's evidence, it is likely that the fraud rate would have been set somewhat higher—in the range between seventy-five and ninety-five percent. Because there was no definitive evidence that could be used to determine an exact fraud rate, the court was required to factor in all relevant evidence and set a reasonable rate. We hold the court set a reasonable rate based upon the record. Accordingly, we affirm the district court's fraud rate determination and the resulting sentence of restitution in the amount of $1,234,270.[5]

D. *Acceptance of Responsibility*

Erhart argues next that the district court erred when it did not apply a three-level downward adjustment for acceptance of responsibility. In support of his claim, Erhart points out that he surrendered to the authorities, cooperated with the officers, and entered a plea of guilty. We review the district court's decision to grant or deny an acceptance of responsibility adjustment for clear error. *United States v. Gonzalez-Rodriguez*, 239 F.3d 948, 954 (8th Cir. 2001).

---

[5]Erhart also argues that because the district court erred in its fraud-rate determination, it also abused its discretion in ordering Erhart to pay restitution in the amount—based on the seventy-five percent fraud rate—of $1,234,270. Because we have already rejected Erhart's assertion that the district court erred in its attributable-loss calculation, this dependent claim also fails.

A defendant is entitled to an acceptance of responsibility reduction when the defendant has shown a recognition and affirmative acceptance of responsibility for relevant conduct, and remorse for that conduct. U.S.S.G. § 3E1.1(a). However, under this Guideline, the defendant must accept responsibility for *all* of the conduct that is part of his conviction. The defendant may not minimize conduct or partially accept responsibility. *United States v. Ngo*, 132 F.3d 1231, 1233 (8th Cir. 1997). Special emphasis is placed on the defendant's honesty about the factual basis for the offense, rather than an emphasis on whether the defendant pleaded guilty or took the matter to trial. *United States v. Schultz*, 917 F. Supp. 1343, 1354 (N.D. Iowa 1996). Thus, a person who shows recognition and affirmative responsibility for his own conduct, and remorse for that conduct, should be granted a sentence reduction. *Id.* Additionally, even a person who pleads guilty to an offense, and then goes to trial on that offense because of a dispute of law, may still receive an acceptance of responsibility reduction in sentence. *Id.*

Erhart claims that his decision to contest the fraud rate was an attempt to resolve a dispute of law, not fact, and he should still be entitled to a reduction for his cooperation. However, Erhart was not merely contesting the applicable law, he was (as the district court noted) "minimizing what really happened." He contested the scope of his crime and disavowed a prior statement in order to minimize his role in the scheme. Additionally, Erhart's guilty plea was one of the "last hour" variety, offered on the eve of trial, after the government had invested substantial time in preparation of litigation. Further, Erhart's confession was incomplete; he contested two of the charges, and, on appeal, he continues to contest one of the charges.

The acceptance of responsibility reduction is "not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the

essential factual elements of guilt." *Id.* at 1347. We affirm the ruling of the district court.

E. *Abuse of Private Trust*

For his next assignment of error, Erhart argues that the district court improperly increased—by two levels—his sentence for abusing a private trust. He claims that because he was not granted discretionary authority by the victim insurers, he was not afforded a "professional" level of trust. We review the district court's conclusion that Erhart occupied a position of trust for clear error. *United States v. Trice*, 245 F.3d 1041, 1042 (8th Cir. 2001).

If a defendant abuses a position of public or private trust in a manner that significantly facilitates his offense, then the Guideline's offense calculation should be increased by two levels. U.S.S.G. § 3B1.3. A public or private trust refers to a position characterized by professional or managerial discretion, whereby the offender is subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. *United States v. Jankowski*, 194 F.3d 878, 884 (8th Cir. 1999). The abuse of trust enhancement applies only where the offender has abused discretionary authority entrusted to the defendant by the victim. In our application of the private trust standard, we simply consider "whether trust is inherent to the nature of the position." *United States v. Brelsford*, 982 F.2d 269, 272 (8th Cir. 1992).

Erhart argues that the insurance companies permitted him little professional discretion. He claims that because the insurance companies were exacting in their examination of his bill submissions, he was not in a position of trust. However, this argument is unpersuasive. If the insurance companies had exercised more control over Erhart, then it is likely the fraud would have been discovered. The fraud

continued as it did precisely *because* the insurance companies trusted Erhart and the accuracy of the claims that he supplied them. Erhart was a licensed chiropractor and, as such, he exercised substantial discretion in preparing and submitting bills and treatment notes.

Chiropractors are providers of professional medical services. Plainly, trust inhered in Erhart's relationship with the insurance companies, and he abused this trust for the specific purpose of committing fraud. Finding no clear error, we affirm the district court's determination that Erhart abused a position of trust.

F. *Role Enhancement*

Erhart also alleges that there was insufficient evidence to establish his role as an organizer, leader, manager or supervisor in this fraud scheme. He claims that because he was equal partners with Ms. Peterson, and their fraudulent business was conducted in equal shares, he should have been (like Ms. Peterson) classified as an average participant. We review the district court's role determination for clear error. *United States v. Gelinas*, 299 F.3d 978, 979 (8th Cir. 2002).

We construe the terms "manager" or "supervisor" broadly under U.S.S.G. § 3B1.1. *United States v. Schwarck*, 961 F.2d 121, 123 (8th Cir. 1992). So much so, that the simple fact that a defendant recruits new members into a conspiracy supports a finding of the defendant being a manager or supervisor. *United States v. Pierce*, 907 F.2d 56, 57 (8th Cir. 1990) (per curiam). Here, Erhart recruited and supervised over six "runners" who provided him with referrals and assisted in perpetuating the fraudulent scheme. This undisputed fact alone provides sufficient support for the imposition of a three-level role enhancement. We therefore affirm the district court's finding that Erhart was a manager or supervisor of a criminal activity involving five or more participants.

G. *Restitution*

Lastly, Erhart contends that the district court's restitution order–issued in accordance with the Mandatory Victims Restitution Act (MVRA)—violates the Ex Post Facto Clause because during the beginning of Erhart's fraud scheme the MVRA was not in effect. Because Erhart raises this claim for the first time on appeal, we will review the district court's order only for plain error. *United States v. Williams*, 128 F.3d 1239, 1243 (8th Cir. 1997).

The Mandatory Victims Restitution Act (MVRA) requires a sentencing court to order a defendant to make restitution to the victim of the offense in the full amount of the victim's loss without consideration of the defendant's ability to pay. 18 U.S.C. § 3664 (f)(1)(A). Prior the MVRA, sentencing courts were required to make a finding regarding a defendant's ability to pay. The district court made no such finding in its restitution order.

The indictment charging Erhart stated that his crimes occurred "[f]rom in or about January 1996 to in or about April 2001." The MVRA became effective April 24, 1996. Erhart claims that because his crime commenced before the MVRA's enactment, he is not subject to its modifications. Specifically, he argues that, in his case, the sentencing court is not relieved of its duty to make a finding as to Erhart's ability to pay prior to the award of restitution.

The Ex Post Facto Clause does indeed prohibit the retrospective application of criminal laws that prejudice a defendant, by providing a shelter from being convicted for a crime that did not exist at the time that the then-legal activity was carried out. However, Erhart is not eligible for ex post facto shelter. Erhart conducted his fraudulent business for approximately five years *after* the MVRA was enacted. He was not prejudiced by a statutory change that occurred after he first committed his

crime because he continued to commit the crime for several years after the enactment of the MVRA. In fact, based on Erhart's own admission, the fraudulent billing began in the later part of 1996, which was subsequent to the MVRA's effective date. Accordingly, we believe that five years of fraudulent activity was fair warning to strip Erhart of any shelter from the Ex Post Facto Clause. Finding no error, plain or otherwise, we affirm the district court.

## III. *Conclusion*

In sum, we are satisfied that Erhart's firearm conviction was supported by sufficient evidence. We see no error in the district court's determination that $1,234,270 was the amount of loss attributable to Erhart—based on seventy-five percent fraud rate. Further the district court correctly denied Erhart an acceptance of responsibility adjustment. Finally, we affirm the abuse of a private trust and role enhancements the district court applied to Erhart's sentence. For the foregoing reasons, we affirm the conviction and conclude that the resulting sentence is reasonable.

---



A TRUE COPY OF THE ORIGINAL
MICHAEL E. GANS, CLERK
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
BY: Michael E. Gans